UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| WESTERN STATES REGIONAL COUNCIL OF CARPENTERS, an Unincorporated Association, | Case No.: 3:25-cv-02544-GPC-JLB |
|---|---|
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| VICTORIA STARR, an individual formerly known as Victoria Velasquez, also known as Victoria S; ATRIA LTD, a California Corporation; MAVERICK STARR PRODUCTIONS, LLC, a California Limited Liability Corporation; ADAMS & ASSOCIATES, an Unincorporated Association, | **[ECF Nos. 14, 15, 16, 17]** |
| Defendants. | |

On December 5, 2025, Defendants filed several Motions to Dismiss. ECF Nos. 14, 15, 16, 17. On December 31, 2025, Plaintiff filed its opposition to the motions. ECF Nos. 19, 20, 21, 22. On January 16, 2026, Defendants filed their reply. ECF Nos. 23, 24, 25, 26. On February 27, 2026, the Court held a hearing on this matter. ECF No. 27. For the

reasons below, the Court GRANTS in part and DENIES in part Defendant's motions to dismiss.

## FACTUAL BACKGROUND

Western States Regional Council of Carpenters ("Plaintiff") is an unincorporated association and nonprofit labor organization that represents union carpenters in twelve western states. ECF No. 12 ("FAC") ¶ 16. Plaintiff employed Defendant Victoria Velasquez ("Velasquez") from August 2019 to August 2024 as Human Relations ("HR") Director, which Plaintiff considered a high-level executive position. *Id*. ¶ 22. As HR Director, Velaquez was head of Plaintiff's HR department, covering hundreds of employees throughout all of the twelve states the organization represented. *Id*. ¶ 23. The role also included access to confidential union personnel records, internal financial records, employee protected health information, and other sensitive employee and union member information. *Id*. ¶ 29. Upon employment, Plaintiff provided Velasquez with a company-issued laptop and access credentials to its computer systems, containing the confidential union information. *Id*. ¶ 30.

As part of her employment, Velasquez joined the Union and "was a member governed and bound by the Union's Bylaws, Resolutions and the Constitution of the United Brotherhood of Carpenters and Joiners of America ("UBC")." *Id*. ¶ 25. Under the UBC Constitution, members are prohibited from disobeying authority, failing to return Union property, misappropriating Union funds, and defrauding the Union. *Id*. ¶ 28.

Velaquez also acknowledged and signed the employee handbook. *Id*. ¶ 32. The handbook included the declaration that the employee "must return the electronic device(s), includ[ing] case, accessories, and peripherals, upon employment termination, transfer, or retirement in accordance with the Council's exit procedures." *Id*. It also stated that "[a]ccess to the Internet, Web sites and other types of Council-paid computer access are to be used for Council related business only." *Id*. ¶ 33. Additionally, it listed the

2

Plaintiff's conflict-of-interest policy, which prohibits employees "from using their positions for personal gain or conducting activities that interfere with the performance of their responsibilities for the Union and further requires employees to disclose any actual or potential conflicts arising under the policy." *Id*. ¶ 48.

In August 2022, Velasquez moved from Los Angeles to San Diego and requested to work from Plaintiff's San Diego office. *Id*. ¶ 63. Her request was granted, but she was required to report in-person to the office every day. *Id*. ¶ 64.

Throughout her employment, Velaquez allegedly engaged in competing work activities without Plaintiff's knowledge. *Id*. ¶ 36. For example, Velaquez used her work time, resources, and property to aid her husband's film production company, including working on a script, and to complete HR consulting work for eight different companies. *Id*. ¶¶ 37, 51-52.

In 2022, Velazquez started and worked for Defendant Atria LTD, which Plaintiff alleges is a competing HR business. *Id*. ¶ 56. Velasquez is the sole officer, director, and registered agent as listed on the California Secretary of State's website registry. *Id*. ¶ 57. Around this time, Plaintiff was given paid leave based on a pregnancy disability during her employment. *Id*. ¶ 6. However, during her pregnancy, Velaquez participated in a filmed podcast, where she stated that she continued to work on her competing career and "picked up a really big client." *Id*. ¶¶ 42-44.

In 2023, while still working full-time for Plaintiff, Velasquez started advertising her HR services on her family's tax and accounting firm, Adams & Associates. *Id*. ¶ 61.

Velasquez also attended multiple HR-related events at the expense of Plaintiff without valid authorization, disclosure, or permission. *Id*. ¶ 71. This included over $12,000 spent on 5-star hotels that violated Plaintiff's travel accommodation policies. *Id*. ¶¶ 71-72. She also enrolled in several courses and obtained credentials with Plaintiff's funds that were not required or related to her position. *Id*. ¶¶ 73-78. Those credentials,

3:25-cv-02544-GPC-JLB

instead, would benefit her businesses Defendants Adam & Associates and Atria LTD. *Id*. ¶ 73. These unauthorized expenses totaled in excess of $30,000. *Id*. ¶ 70.

In July or August 2024, Plaintiff discovered that Velasquez was not reporting into the San Diego office; instead, she had worked remotely without authorization over the course of two years. *Id*. ¶ 66. When requested to report to Plaintiff's headquarters to discuss the issue, Velasquez demanded time off and refused to meet with upper management. *Id*. ¶ 68, 69. Velasquez was, thus, terminated on August 29, 2024. Around that time, Plaintiff also discovered that Velasquez had misused Plaintiff's funds.

Upon termination, Velasquez was ordered to return all Plaintiff's property, including her laptop and files. *Id*. ¶ 31. Velasquez failed to do so. *Id*. ¶ 34. Plaintiff's IT Department, instead, detected unauthorized attempts to access Plaintiff's protected computer systems and databases, originating from Velasquez's unreturned laptop. *Id*. ¶ 83. Because of Velasquez's refusal to return Plaintiff's property and unauthorized access to Plaintiff's computer systems, Plaintiff diverted substantial resources to monitor for additional access attempts, identify compromised credentials, assess potential data exposure, reconfigure its systems, and enhance security protocols. *Id*. ¶ 89. These measures allegedly exceeded $5,000 to complete.

On August 12, 2025, Velasquez filed a state court complaint against Plaintiff and other parties, alleging discrimination, harassment, retaliation, wrongful termination, and negligent supervision and retention. ECF No. 15-1 at 8-9.[1] This case is still pending.

## PROCEDURAL HISTORY

On September 26, 2025, Plaintiff filed a complaint. ECF No. 1. On November 21, 2025, Plaintiff filed its first amended complaint. ECF No. 12. The FAC alleges (1)

---

[1] Throughout the order, the pagination for docketed documents is derived from the numbering generated by the ECF system.

violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, (2) breach of fiduciary duty, 29 U.S.C. 501, (3) violation of the Labor Management Relations Act § 301, (4) violation of California Penal Code § 502, (5) aiding and abetting a breach of fiduciary duty, (6) civil conspiracy, (7) conversion, (8) breach of loyalty under California common law, (9) unjust enrichment, and (10) fraud and deceit, Cal. Civ. Code §§ 1709-1710. *Id*. ¶¶ 108-177. Counts 5, 6, and 9 were brought against all Defendants. The remaining causes of action were brought only against Defendant Velasquez.

On December 5, 2025, Defendants each filed a separate motion to dismiss for failing to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 14, 15, 16, 17. On December 31, 2025, Plaintiff filed its opposition to the motions. ECF Nos. 19, 20, 21, 22. On January 16, 2026, Defendants filed their reply. ECF Nos. 23, 24, 25, 26.

## LEGAL STANDARD

Rule 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1081 (9th Cir. 2024) (citing *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). To survive a motion to dismiss, the complaint must contain a "short and plain statement showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), backed by sufficient facts that make the claim "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Rather, it requires enough factual content for the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). In reviewing the plausibility of a complaint, courts must "accept factual allegations in the complaint as true and construe

3:25-cv-02544-GPC-JLB

them in the light most favorable to the non-moving party." *Dent v. Nat'l Football League,* 968 F.3d 1126, 1130 (9th Cir. 2020).  But courts do not accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023).  Ultimately, the court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

## DISCUSSION

The Defendants present several arguments in their motions to dismiss. As to counts alleged against Velasquez alone, Velasquez maintains that (1) the First Count does not plausibly allege hacking or reasonable damages, (2) the Second Count fails based on a lack of a private right of action, Velasquez's non-fiduciary status, and speculation, (3) the Third Count fails given its time-barred status and because Velasquez is not an employer or labor organization, (4) supplemental jurisdiction over Counts 4, 7, 8, and 10 should not be exercised, (5) Count 4 alternatively does not plausibly allege access or hacking, and (6) Count 10 alternatively does not sufficiently plead willful deceit or intent to induce Plaintiff to alter its position. *See* ECF No. 14-1 ("Vel. Mot.") at 14-33.

Velasquez also challenges the remaining Counts, and her arguments are substantively identical to the arguments of Defendants Atria LTD, Maverick Starr Productions, LLC, and Adams & Associates (collectively, "Entity Defendants"). In their motions, all Defendants contend that (1) supplemental jurisdiction should not be exercised over Counts 5, 6, and 9, (2) in the alternative, Plaintiff does not sufficiently

3:25-cv-02544-GPC-JLB

plead a breach of fiduciary duty for Count 5, (3) Count 6 fails because Velasquez is not a fiduciary and a wrongful act was not sufficiently pled, and (4) the Ninth Count does not sufficiently plead a benefit to the Defendants. *See id*.; ECF Nos. 15-1, 16-1, 17-1 at 7-20.

Plaintiff opposes all of Defendants' arguments. *See* ECF No. 19 ("Opp.").

## I.    Count 1: Computer Fraud and Abuse Act ("CFAA")

"[T]o bring an action successfully under 18 U.S.C. § 1030(g) based on a violation of 18 U.S.C. § 1030(a)(2), [a plaintiff] must show that [the defendant]: (1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that he (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate or foreign communication), and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009).

Defendant Velasquez argues that Count 1 fails because it does not plausibly allege the second and fifth prongs. Namely, in her view, Velasquez's actions are not without authorization and reasonable damages of $5,000 are not alleged.

### A.    Unauthorized Access

18 U.S.C. § 1030(a)(2) is violated where a person "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains… information from any protected computer." 18 U.S.C. § 1030(a)(2).

Velasquez contends 1) that her use of the computer was not without authorization and 2) that Plaintiff has not adequately alleged access.

### 1.    Without Authorization

One is without authorization when she "has no rights, limited or otherwise, to access the computer in question." *Brekka*, 581 F.3d at 1133. In the context of employment, "it is the employer's decision to allow or to terminate an employee's

authorization to access a computer that determines whether the employee is with or without authorization." *Id*.

Velasquez maintains that Plaintiff provided her initial access to the alleged "stolen laptop" and, therefore Plaintiff cannot plausibly allege that she accessed the laptop "without authorization." Vel. Mot. at 14-15. However, just as authorization can be granted, it can also be revoked. *See United States v. Nosal*, 844 F.3d 1024, 1035 (9th Cir. 2016) ("Implicit in the definition of authorization is the notion that someone, including an entity, can grant or revoke that permission."). Thus, even if an employer initially granted permission to access a computer to an employee, the employer has the discretion to rescind permission, making further use of that computer "without authorization" under § 1030(a)(2). *Id*. at 1034. This revocation of authorization can be indicated by a termination of employment. *See Brekka*, 581 F.3d at 1136 ("There is no dispute that if Brekka accessed LVRC's information on the [traffic monitoring] website after he left the company ..., Brekka would have accessed a protected computer 'without authorization' for purposes of the CFAA.").

Here, Plaintiff terminated Velasquez's employment. FAC ¶ 69. The employee handbook, which Velasquez acknowledged and signed, outlined that computer access would be limited to Plaintiff's business and that all devices must be returned to Plaintiff upon termination. *Id*. ¶¶ 32-33. Finally, Plaintiff expressly ordered Velasquez to return all of Plaintiff's property, which included laptops and files, upon her termination. *Id*. ¶ 31. Considering all these facts in combination, Plaintiff has sufficiently alleged that it had revoked Velasquez's prior authorization. Thus, any subsequent use of the laptop by Velasquez after her termination was without authorization.

### 2.    Access

Velasquez argues that the FAC does not adequately allege that "Velasquez entered or accessed any of Plaintiff's password-protected websites or databases, after her

3:25-cv-02544-GPC-JLB

termination or altered any information on those websites or databases." ECF No. 23 at 1-2; *see* Vel. Mot. at 16. Essentially, Velasquez maintains that the claim fails because the FAC does not specifically "allege a misuse of a company password or login, access of any particular database, alteration of any information or when the attempts occurred." Vel. Mot. at 16.

However, this level of specificity is not required under the statute. As used in the statute, a person must access the protected computer and obtain information from that protected computer. *See* 18 U.S.C. § 1030(a)(2).

Here, Plaintiff alleged that Velasquez was given a laptop and access credentials to its protected computer systems, containing confidential information. FAC ¶ 30. Once she was terminated, Plaintiff ordered Velasquez to return the laptop, but Velasquez refused to do so. *Id*. ¶ 31, 34. Instead, Velasquez allegedly continues to possess and use the protected computer. *Id*. ¶ 34. Plaintiff supports this allegation by stating that its IT department detected unauthorized attempts to access its protected computer systems from Velasquez's computer and a screenshot of Velasquez accessing the computer without authorization. *Id*. ¶ 83. Taking these factual allegations as true, the Court has enough factual content to "draw the reasonable inference that the defendant is liable for the misconduct alleged," namely accessing and obtaining information from a protected computer. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Twombly*, 550 U.S. at 556). Accordingly, Plaintiff has adequately alleged unauthorized access under the CFAA.

**B.    Reasonable Damages**

When a plaintiff "suffers damage or loss by reason of a violation of [the statute]," the plaintiff has a private right of action "against the violator to obtain compensatory damages and injunctive relief or other equitable relief" if they meet one of five possible categories *Id*. § 1030(g).  As relevant to this case, one of these categories is triggered if

3:25-cv-02544-GPC-JLB

the offense caused "loss to 1 or more persons during any 1-year period…aggregating at least $5,000 in value." *Id*. § 1030(c)(4)(A)(i)(I).

The statute defines both "damage" and "loss." "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030(e)(8). Physical manipulation or deletions of data, programs, or systems are not required for damage to occur. Instead, "[i]t is sufficient to show that there has been an impairment to the integrity of data, as when an intruder retrieves password information from a computer and the rightful computer owner must take corrective measures 'to prevent the infiltration and gathering of confidential information.'" *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F.Supp.2d 887, 894–95 (N.D. Cal. 2010) (citations omitted); *see Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1049 (N.D. Cal. 2018); *Therapeutic Rsch. Fac. v. NBTY, Inc.*, 488 F. Supp. 2d 991, 966 (E.D. Cal. 2007) ("The alleged unauthorized access to the Publication and the disclosure of its information may constitute an impairment to the integrity of data or information even though 'no data was physically changed or erased.'").

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11). In this context, loss accounts for "the types of costs ... related to fixing a computer." *Nowak v. Xapo, Inc.*, No. 5:20-CV-03643-BLF, 2020 WL 6822888, at *4 (N.D. Cal. Nov. 20, 2020) (quoting *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004), *aff'd*, 166 F. Appx. 559 (2d Cir. 2006). This includes "[t]he cost of investigating unauthorized access and securing a computer network." *Cline*, 329 F. Supp. 3d at 1049.

3:25-cv-02544-GPC-JLB

First, Velasquez contends that the FAC contains no plausible allegations of damage to the integrity of data. Specifically, in Velasquez's view, Plaintiff only claims the taking of information and does not allege facts indicating that the data's completeness, useability, or availability was impaired.

However, the FAC alleges that Velasquez continues to possess and use the protected computer without authorization, giving her access to confidential information. FAC. ¶ 34. This allegation indicates unauthorized access to a protected system and disclosure of confidential information, which falls under the "damage definition." *See Therapeutic Rsch. Fac.*, 488 F. Supp. 2d at 966. Physical changes affecting the use or availability of data are not required.

Based upon that damage, Plaintiff allegedly incurred costs exceeding $5,000 when it dedicated "resources to monitor for additional access attempts, identify compromised credentials, and assess potential data exposure." FAC ¶¶ 85, 89. As these costs are for investigating unauthorized access and securing Plaintiff's computer systems, Plaintiff has also adequately met the "loss" definition.

At the same time, Plaintiff also alleged that its efforts "revealed vulnerabilities and necessitated system reconfiguration and enhanced security protocols." *Id*. ¶ 89. However, the language of this allegation indicates that those vulnerabilities preexisted and were not a result of Velasquez's actions. Thus, because the allegation does not link Velasquez's actions to those computer issues, the vulnerabilities and subsequent remedial measures would not be part of the "loss" calculation.

Second, Velasquez maintains that the FAC only ambiguously refers to the damages associated securing Plaintiff's system and does not clearly outline how the damages amounted to $5,000. Vel. Mot. at 18. However, Plaintiff has alleged that it "has incurred costs exceeding $5,000 within one year, including forensic review, system security measures, and related expenses, because of [Velasquez's] refusal to return [Plaintiff's]

3:25-cv-02544-GPC-JLB

property." FAC ¶ 85. No further specificity is needed at this stage. *See Biden v. Ziegler*, 737 F. Supp. 3d 958, 974 (C.D. Cal. 2024) ("Plaintiff has specifically alleged this, asserting that he suffered 'direct costs, incurred during any one-year period, of investigating and responding to Defendants violations of the CFAA in excess of $5,000 in value.' [ ] That is enough for pleading purposes.").

In sum, Plaintiff has plausibly alleged reasonable damages under the CFAA.

## II.    Count 2: LMRDA § 501

Defendant argues that Plaintiff does not have a private right of action under Section 501 of the LMRDA because the statute as a whole provides a right of action only to a union *member*, not a union itself. Vel. Mot. at 19. Plaintiff, in contrast, maintains that only Section 501(b) has that limitation, while unions are permitted to "enforce its rights under Section 501(a)." ECF No. 19 at 12.

These arguments reflect a split between federal district courts in this circuit and throughout the country. *See Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375 n.16 (1990) ("Courts have reached inconsistent positions on the question whether a union may bring suit under § 501."); *United Bhd. of Carpenters & Joiners of Am. v. Shapiro*, No. 2:22-CV-01099-JHC, 2023 WL 2161701, at *2 (W.D. Wash. Feb. 22, 2023) (collecting cases).

In relevant part, Section 501 of the LMRDA provides:

"(a) *Duties of officers; exculpatory provisions and resolutions void*

The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution

12

and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

(b) *Violation of duties; action by member after refusal or failure by labor organization to commence proceedings; jurisdiction; leave of court; counsel fees and expenses*

When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) *and the labor organization or its governing board or officers refuse or fail to sue* or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, *such member may sue such officer*, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. The trial judge may allot a reasonable part of the recovery in any action

13

under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation."

29 U.S.C. § 501 (emphasis added).

In essence, Section 501(a) establishes that "officers, agents, shop stewards, and other representatives of a labor organization" occupy positions of trust in relation to such organization and its members as a group and establishes a set of specific fiduciary duties owed to the labor organization. Section 501(b) then explicitly confers jurisdiction upon individual union members to file a derivative suit on behalf of the union.

What is disputed here is whether §§ 501(a) and (b), read together, provides a union an implied right to sue under 501 and whether *Traweek* has decided this issue.

**A.    *Traweek***

In arriving at its decision, the *Traweek* court spoke definitively on § 501(b) but did not specifically analyze a union's right of action under § 501(a). The court began its analysis by noting that it was required to narrowly construe § 501(b) because of the federal policy of noninterference in the internal affairs of unions and because § 501(b) extends federal court jurisdiction. *See Phillips v. Osborne*, 403 F.2d 826, 828 (9th Cir.1968) ("[S]tatutes extending federal jurisdiction, such as Section 501(b), are narrowly construed so as not to reach beyond the limits intended by Congress."). The *Phillips* court held that narrow construction of such a statute is especially appropriate when it generally concerns rights subject to full and satisfactory vindication in state courts. *Id*. As it relates to unions, *Traweek* observed that it was uncontested that the union may sue its officers either in state court or under other federal statutory authority. *See Bldg. Material & Dump Truck Drivers, Loc. 420 v. Traweek*, 867 F.2d 500, 506 (9th Cir. 1989).

3:25-cv-02544-GPC-JLB

As for § 501(b), *Traweek* found "[t]he literal language of the statute [to be] clear—it authorizes an individual union member to bring suit if a union refuses or fails to sue." *See Traweek*, 867 F.2d at 506. Further, Section 501(b), by its terms, does not establish a private right of action for a union itself. *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 374 n.16 (1990). This point is uncontested.

In terms of § 501(a), a number of district courts in the Ninth Circuit have found that because *Traweek* "did not consider whether Section 501(a) implies a right of action by unions" that it did not foreclose a possibility of a union maintaining a cause of action under 501(a). *Serv. Emps. Int'l Union v. Roselli*, No. 09-CV-00404-WHA, 2009 WL 1382259, at *2 (N.D. Cal. May 14, 2009) ("The actual holding of *Traweek* expressly pertained only to Section 501(b) and not to Section 501(a)."); *Hawaii Reg'l Council of Carpenters v. Yoshimura*, 237 F. Supp. 3d 1029, 1035-36 (D. Haw. 2017) ("Court agrees with *Roselli* that *Traweek* did not foreclose the possibility of a union maintaining a cause of action under § 501(a) and agrees with *Roselli*'s determination that an implied cause of action exists for unions to sue under § 501(a)"); *Carpenters Loc. Union 721 v. Limon*, No. 18-CV-8470 DSF (MRWX), 2020 WL 3124222, at *3 (C.D. Cal. Apr. 23, 2020) (finding § 501(a) is not limited to actions by a union member).

Meanwhile, other district courts have found that *Traweek* and *Phillips* are dispositive in finding that there is no implied cause of action for unions. *Commc'ns Workers of Am., Loc. 9423 v. Alvarado*, 629 F. Supp. 3d 988, 995-96 (N.D. Cal. 2022) (*Traweek* squarely addressed "whether a union standing alone can bring a § 501 suit as an initial matter."); *Serv. Emps. Int'l Union v. Rosselli*, No. 08-CV-2777-JFW PLAX, 2008 WL 3342721, at *3 (C.D. Cal. July 22, 2008) (rejecting argument that *Traweek* "only precluded a union suit under section 501(b), and not under section 501(a)"); *United Bhd. of Carpenters & Joiners of Am. v. Sanchez*, No. 3:22-CV-05416-JHC, 2023 WL 2161697, at *2-3 (W.D. Wash. Feb. 22, 2023) (applying *Philips*, narrow construction

15

of § 501 does not support implied cause of action); *United Bhd. of Carpenters & Joiners of Am. v. Shapiro*, No. 2:22-CV-01099-JHC, 2023 WL 2161701, *4 (W.D. Wash. Feb. 22, 2023) (same).

Here, Plaintiff avoids contending with the effect of *Traweek* by relying on *Servs. Emps. Int'l Union v Nat'l Union of Healthcare Workers*, 718 F. 3d 1036 (9th Cir. 2013) (hereinafter "*SEIU I*") as supporting its standing claim. Plaintiff argues that by affirming the union's recovery of damages against individual members of a union, the *SEIU I* court confirmed that the labor organization itself possesses the right to enforce these duties. ECF No. 19 at 11-12. Further, Plaintiff points to district courts that have relied on *SEIU I* to support the conclusion that unions possess an implied right of action against individual members. *Id*. This argument fails to persuade because the individual union members in *SEIU I* did not challenge the Union's standing to sue under § 501 and, instead, questioned any duty to the union under § 501. As a result, the Ninth Circuit had no occasion to apply or consider *Traweek*. Though *SEIU* found in favor of a union under § 501(a), the opinion "contains no discussion of whether a cause of action may be implied, and it does not cite *Traweek*." *Alvarado*, 629 F.Supp.3d at 995.

As a threshold matter then, the Court must gauge to what extent the analysis in *Phillips* and *Traweek* applies here. First, the union in *Traweek* did not rely on § 501(a) to support an implied cause of action and the court's analysis did not specifically address whether §§ 501(a) and (b) created such a cause of action. *Traweek* only interpreted the language in § 501(b) and relied upon *Phillips* which itself was limited to analyzing § 501(b). Further, *Phillips* also did not involve a union seeking to sue an individual member. Instead, it involved a former union member who had withdrawn from the union that he sought to sue under § 501(b). Given the facts and focus of the case, the analysis in *Phillips* and *Traweek* supports a narrow construction of § 501 in general but, otherwise, has little application to the case here. *Cf. Illinois Bd. of Elections v. Socialist Workers*

3:25-cv-02544-GPC-JLB

*Party*, 440 U.S. 173, 183 (1979) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)) ("Questions which 'merely lurk in the record' are not resolved, and no resolution of them may be inferred."). The Court concludes neither *Traweek* nor *Phillips* are dispositive and therefore proceeds to analyze § 501 to determine whether it creates an implied cause of action for a union to sue an individual union representative.

### B.     Implied Right to Sue under § 501

Ultimately, private rights of action to enforce federal law must be created by Congress. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979) (remedies available are those "that Congress enacted into law"). Courts must therefore be "reluctant" to "provide a private cause of action where the statute does not supply one expressly." *Sosa v. Alvarez–Machain*, 542 U.S. 692, 727 (2004). The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979). Statutory intent on this latter point is determinative. *See, e.g., Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991).

In interpreting § 501(b), the *Traweek* court found evidence of Congress's intent to grant the remedy solely to the union members in § 501(b)'s requirement that union members request leave of the court before suing. *Traweek*, 867 F.2d at 506; *see Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  However, as discussed above, *Traweek* did not have occasion to examine whether Congress had expressed the intent to create an implied cause of action under §§ 501(a) and (b) in favor of the unions.[2]

---

[2] It is notable, however, that § 501(b) provides an express remedy to union members but not unions, as it is "an 'elemental canon' of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies." *Karahalios v. National Federation of Federal Employees, Local 1263*, 489

Other circuit courts have examined § 501 to determine whether Congress expressed an intent to provide a union standing to sue individual members. The results are mixed.

In *Int'l Union, Sec., Police & Fire Pros. of Am. v. Faye*, 828 F.3d 969, 977 (D.C. Cir. 2016), the D.C Circuit Court found that *Weaver v. United Mineworkers of America*, 492 F. 2d 580, 586 (D.C. Cir. 1973) was dipositive in providing a union an implied cause of action under § 501. But the court disagreed as to whether Congress had expressed the intent to do so. One concurring opinion noted that "[b]y creating federal rights and an express derivative federal cause of action for union members to bring 'for the benefit' of the union—if the union does not itself 'commence proceedings'—section 501 reveals Congress's intent that the union be able to enforce the duties its agents owe it in federal court." *Id*. at 977. However, another concurring opinion expressed doubts that such intent was revealed stating that "if we were writing on a clean slate, the relevant indicia of statutory intent would, in my view and as well explained by the dissenting opinion, weigh heavily against implying a right of action for unions to prosecute lawsuits under Section 501." *Id.* at 982. The dissenting opinion authored by Judge Kavanaugh[3] explained that in enacting § 501 "Congress chose to create a cause of action, but only for union members

U.S. 527, 533 (1989) (citation omitted); *see also Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19–20 (1979). After all, "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). However, even settled rules of statutory construction could yield to persuasive evidence of a contrary legislative intent. *Sec. Inv. Prot. Corp. v. Barbour*, 421 U.S. 412, 419 (1975).

[3] Because this case involves a dissenting opinion before Justice Kavanaugh's appointment to the Supreme Court, for clarity the Court will refer to Justice Kavanaugh as Judge Kavanaugh in this opinion.

3:25-cv-02544-GPC-JLB

and not for unions. That decision strongly suggests that Congress intended to allow union members—and only union members—to sue under Section 501." *Id*. at 985.

Unlike the majority in the *Faye* case, the *Traweek* court rejected the Union's argument that *Weaver v. United Mineworkers of America* supported an implied cause of action. *Bldg. Material & Dump Truck Drivers, Loc. 420 v. Traweek*, 867 F.2d 500, 506 (9th Cir. 1989). However, the Eleventh Circuit relied on the analysis in *Weaver* in reading subsections (a) and (b) of § 501 together and concluding that the statute as a whole created an implied federal cause of action for labor organizations. *Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO v. Statham*, 97 F.3d 1416, 1421 (11th Cir. 1996) ("By giving the union the right of first refusal to the cause of action, section 501(b) shows Congress preferred that the union, rather than individual members, sue on its own behalf."). The Seventh Circuit in *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Ward* then approvingly cited *Statham* and stated, "we agree with the Eleventh Circuit that the text and remedial structure of § 501(a) and (b), read together, imply both federal rights and a federal remedy for labor organizations against union officers who violate their statutory duties." 563 F.3d 276, 288 (7th Cir. 2009).

In determining whether Congress has created an implied cause of action, the Court focuses on Congress's intent and looks for explicit or implicit evidence from the text and legislative history that supports the creation of a right. *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1103 (1991).

A review of the text discloses that § 501(a) does three things (1) establishes a fiduciary duty owed by individual representatives of the union to the union and its members; (2) identifies specific obligations owed to the union and individual members; (3) declares void any general exculpatory provision which relieves any covered individual for breach of the duties that are specifically identified.  Section 501(b) explicitly establishes a union member's derivative right to sue the union when the union

fails to take steps to protect the union from corruption and permits the individual to sue in state or federal court. There is no question that Congress intended to impose enforceable fiduciary obligations under § 501(a). But whether Congress intended additionally that a statute would be enforced through private litigation is a different question. *See Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 18 (1979).

With respect to the legislative intent, Congress enacted the LMRDA in 1959 in response to various union corruption scandals and an associated congressional investigation. *Int'l Union, Sec., Police & Fire Pros. of Am. v. Faye*, 828 F.3d 969, 972 977 (D.C. Cir. 2016); *see* 29 U.S.C. § 401(b) (explaining that Congress had found "a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct"). At the time § 501 was enacted, states permitted unions to sue individual members in state court for fiduciary claims but did not recognize an individual member's standing to sue corrupt union officers. See S. Rep. No. 86–187, at 72 (1959) (minority views); *Statham*, 97 F.3d at 1420. In addition, Congress knew that unions already had state-law causes of action available to them. *Faye*, 828 F.3d at 977 (Tatel, J., concurring), *see also* H.R. Rep. No. 86–741, at 81 (1959) (supplementary views). While unions could sue their officers under state law, the unions were sometimes choosing not to do so for corrupt reasons. *See Phillips v. Osborne*, 403 F.2d 826, 828–29, 831–32 (9th Cir. 1968).

Section 501, thus, aimed to protect unions against corrupt practices by union representatives by enabling individual members to sue on behalf of the union where the union failed to utilize state law to do so. Because state law varied, the method devised by Congress was to establish specific fiduciary duties owed to the union and its membership and then permit individual members of unions to exercise the corresponding rights in

federal or state courts when a union failed to enforce them.[4]  The regime further required a court to find good cause for the individual to sue on behalf of the union. Under this structure, federal courts were forums of last resort in limited circumstances.

Based on the above history, Judge Tatel, in his concurring opinion in *Faye*, found that Congress chose to address the corruption problem by declaring federal duties the union agents owed the union and creating a federal remedial scheme that includes a derivative-like suit.  *Faye*, 828 F. 3d at 977 (Tatel, J. concurring). By doing so, "[s]uch a scheme obviously depends for its coherence on the ability of the union to control the suit that, after all, ultimately belongs to it." *Id*. The additional remedy "consists merely of allowing the ultimate owner of a derivative claim to bring suit in its own name." *Id*.

However, Judge Kavanaugh replied, "Congress did not need to allow unions to sue under federal law because unions, unlike union members, already could bring suit against union officers under state law. And so Congress did not need to—and did not—create a new federal cause of action for unions." *Faye*, 828 F.3d at 986 (Kavanaugh, J., dissenting); *see Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. 20 v. Leu*, No. 76-CV-221, 1976 WL 1685, at *1 (N.D. Ohio Oct. 22, 1976) ("The statutory language confers upon the union as a unit no right to sue its officers. Unions are left to the state law jurisdiction they have always had."). [5]

In *Statham*, the court also found that the enforcement regime in § 501 suggests that Congress intended to supplement the remedies available to unions by creating new

---

[4] Congress was aware of state fiduciary duty but nonetheless "considered it important to write the fiduciary principle explicitly into Federal labor legislation." H.R. Rep. 86-741 (1959).

[5] In this case, the Union has sued Defendant for federal claims under the LRMA and CFAA, and state claims for breach of fiduciary duty, conspiracy, conversion, unjust enrichment and fraud. ECF No. 12 at 20-27.

federal protections. *Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO v. Statham*, 97 F.3d 1416, 1420 (11th Cir. 1996). As a result, in that court's view, it would make no sense to impose federal duties and simultaneously deny the unions the right to enforce those duties. *Id*. In contrast, the *Traweek* court observed that unions still "may sue its former officers either in state court or under other federal statutory authority." *Bldg. Material & Dump Truck Drivers, Loc. 420 v. Traweek*, 867 F.2d 500, 506 (9th Cir. 1989).

To the extent that § 501(a) establishes new federally recognized duties and rights, they can be enforced in state court along with the other state causes of action available to the Plaintiff. *But see Faye*, 828 F. 3d at 986 (Kavanaugh, J., dissenting) ("[N]othing in Subsection (b) suggests that Congress intended to allow unions to bring suit under *federal* law rather than *state* law."). Plaintiff is not denied the right to enforce the federal duties, only the right to sue in federal court and an implied cause of action would not substantially further the purpose of § 501. While permitting unions to enforce the duties provided under § 501(a) could be viewed as compatible with the remedial scheme created in support of a derivative lawsuit, it merely provides cumulative remedies for unions and is not coupled with persuasive evidence on Congress's intent to create an implied cause of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) (without evidence of intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute").

More problematic for the Plaintiff's position is the legislative history reveals that one Senate bill expressly provided for suits by unions, S. 748, 86th Cong.§ 301 (1959),

and that bill's provisions were not adopted.[6] *Crosley v. Katz*, 131 L.R.R.M. 2175, 2176–77 (E.D. Pa. Sept. 9, 1988). The fact that an explicit cause of action was created for individual members but then rejected for unions reveals that not only did Congress know how to create an explicit cause of action, but it also expressly chose not to do so in the case of unions suing individual union representatives. Statutory intent on this latter point is determinative. *See, e.g.*, *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991).

In sum, the Court finds that a union does not possess the right to prosecute an implied § 501 cause of action in federal court where (1) Congress explicitly created one for individual members but not unions, (2) unions already have the ability to sue individual members in state court, (3) Congress considered an explicit cause of action but rejected the amendment, and (4) an implied cause of action does not substantially advance the purpose of § 501. Thus, the Court finds that Plaintiff has failed to demonstrate that Congress intended to create an implied cause of action for unions to sue individual union representatives for breaches of a fiduciary duty in federal court.

## III.   Count 3: LMRA § 301

Count 3 presents a claim under §301(a) of the LMRA.  It alleges defendant Velasquez violated the union constitution by misappropriating funds to enrich her personal business, defrauding the Union with her lavish travels and educational endeavors and her unauthorized access and continued use of Union property." FAC ¶ 111.  Plaintiff seeks injunctive relief requiring Defendant to return Union property and prohibiting Defendant from further misuse of the property. *Id*. ¶ 112.

---

[6] S. 748, § 301 was introduced by Senator Goldwater who represented the Administration's views and succeeded in having fiduciary proposals in § 501(a) added to the Senate bill on the floor.

3:25-cv-02544-GPC-JLB

Section 301 of the LMRA, 29 U.S.C. § 185, confers federal jurisdiction over "suits for violation of contracts between an employer and a labor organization ... or between any such labor organizations." Given this language, Defendant contends that this action fails because Velasquez is not an employer or a labor organization. Vel. Mot. at 26. Relying on *Woodell* and *SEIU II*, Plaintiff, in turn, argues Velasquez's violation of the Union Constitution is enough to provide jurisdiction under Section 301. ECF No. 19 at 13.

As expressed by the Supreme Court, the primary purpose of the LMRA is "to promote the achievement of industrial peace through encouragement and refinement of the collective bargaining process." *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 509 (1962). Because "such an effort would be purposeless unless both parties to a collective bargaining agreement could have reasonable assurance that the contract they had negotiated would be honored…Section 301(a) reflects congressional recognition of the vital importance of assuring the enforceability of such agreements." *Id*.

In discussing these purposes, "the Supreme Court focused on the accountability of union organizations and employers, not union members." *Bldg. Material & Dump Truck Drivers, Loc. 420 v. Traweek*, 867 F.2d 500, 507 (9th Cir. 1989). In particular, the Supreme Court found that Congress was "concerned that unions be made legally accountable for agreements into which they entered among themselves." *United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of United States & Canada, AFL-CIO v. Loc. 334, United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of United States & Canada*, 452 U.S. 615, 624 (1981). Accordingly, § 301(a) allows a suit to be brought by:

(1)    A union against an employer,

(2)    An employer against a union,

(3)    A union against another union,

24

3:25-cv-02544-GPC-JLB

(4)    Individual union members against their union, and

(5)    Individual union members against their employer.

*See, e.g., Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW), AFL-CIO v. Hoosier Cardinal Corp.*, 383 U.S. 696, 698 (1966); *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 214-15 (1979); *Kinney v. International Brotherhood of Electrical Workers*, 669 F.2d 1222, 1229 (9th Cir.1981); *Journeymen*, 452 U.S. at 620; *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976).

Whether a union can bring an action under § 301 against an individual union member is not clear cut and requires a nuanced analysis. Specifically, while union constitutions are understood to be contracts between labor organizations, *Journeymen*, 452 U.S. at 623, this does not necessarily mean any failure to comply with by-laws or the constitution necessarily falls within the purview of § 301, *Bldg. Material & Dump Truck Drivers, Loc. 420 v. Traweek*, 867 F.2d 500, 508 (9th Cir. 1989).

In *Traweek*, for example, a union had sued two former officers for misuse of union funds and other violations of union rules, resulting in an order for the former officers to repay the union. 867 F.2d at 503-05. On appeal, the officers challenged the district court's jurisdiction under § 301(a). *Id*. at 507-08. In its analysis, the Ninth Circuit emphasized that the purpose of § 301(a) was centered on accountability of unions over union members. *Id*. at 507. It also held that the Supreme Court's opinion in *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401 (1981) primarily focused "on Congress' intent to immunize individual members from a § 185 suit." *Id*. at 508. With that, the Ninth Circuit held in the officers' favor, stating that federal courts should not provide a forum for unions "to demand payment or to settle internal squabbles" every time "a union member failed to pay dues or committed a minor infraction of union rules." *Id*.

*Traweek* aligns closely with the facts of this case. Velasquez is a former officer of Plaintiff. Plaintiff has alleged that Velasquez violated § 301 and the UBC Constitution

25

when she misappropriated funds, defrauded the Union with lavish travel and educational endeavors, and continued to use Union property without authorization. FAC ¶ 111. These allegations are akin to the violation of union rules which *Traweek* found did not warrant subject-matter jurisdiction under § 301.

Plaintiff attempts to distinguish *Traweek* by relying on *SEIU II*. ECF No. 19 at 13. In that case, an international labor organization sued three former leaders of one of its affiliated local unions and a new union the three former officers had formed to compete against their former employer. *Serv. Emps. Int'l Union v. Nat'l Union of Healthcare Workers* ("*SEIU II*"), 598 F.3d 1061, 1064-65 (9th Cir. 2010). Before being relieved of their duties, the former officers "commenced a strategy to vigorously resist the trusteeship, disrupt union operations, and undermine the ability of any trustee to govern." *Id*. Given *Traweek*, the former officers argued that § 301(a) jurisdiction was foreclosed.

The Ninth Circuit, however, held the facts of the case to be distinguishable from *Traweek* and found § 301(a) jurisdiction. "*Traweek* concerned individual wrongs and individual liability," which created "good reason to deny jurisdiction." *Id*. at 1071-72. In contrast, *SEIU II* concerned not only "the personal liability of one or two former officers, but a contest between two unions competing for the hearts and minds of the rank and file." *Id*. at 1072. *Traweek* also concerned financial liability rather than a request for injunctive relief. *Id*. Based on those differences, the Ninth Circuit concluded that jurisdiction was not completely foreclosed by *Traweek*.

Plaintiff submits the Court should similarly hold that § 301 provides "jurisdiction over an action by a union against former officers to return union property because enforcing the constitution promote[s] stability in labor relations." ECF No. 19 at 13.

Here, the instant case does involve a request for injunctive relief under § 301, meaning that *Traweek* does not immediately dispose of this claim. *See* FAC ¶ 112. Nonetheless, unlike *SEIU II*, the FAC focuses on Velasquez's individual wrongs and

26

3:25-cv-02544-GPC-JLB

individual liability rather than wrongs which threaten wider labor relations. Thus, there is "good reason to deny jurisdiction," given that the allegations are more like the "internal squabbles" and union rule violations that both *Traweek* and *SEIU II* wanted to avoid flooding the courts with. *SEIU II*, 598 F.3d at 1072. Accordingly, Plaintiff lacks subject-matter jurisdiction to bring a § 301 claim in this case.

## IV.    Counts 4-10: Supplemental Jurisdiction

In an action over which a district court possesses original jurisdiction, the court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The supplemental jurisdiction statute "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and citation omitted).

District courts have discretion to decline to exercise supplemental jurisdiction if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Defendants contend that this Court should decline to exercise supplemental jurisdiction over the FAC's state law claims, Counts 4-10. Vel. Mot. at 27-28; ECF No.

3:25-cv-02544-GPC-JLB

15-1 at 14-15. Specifically, Defendants maintain there is no supplemental jurisdiction (1) if the Court dismissed all federal claims or (2) because the state claims predominate. *Id.*

First, since the Court has not dismissed Plaintiff's first federal claim, Count 1, the Court will not decline to exercise supplemental jurisdiction for that reason.

As for the second contention, district courts may decline to exercise supplemental jurisdiction over a claim if "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction." 28 U.S.C. § 1367(c)(2). Declining supplemental jurisdiction would be appropriate where "it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

Here, the FAC alleges three federal claims and seven state claims. FAC ¶¶ 86-177. As discussed above, only one federal claim remains, specifically the CFAA claim. The seven state claims include a violation of the California Computer Data Access and Fraud Act (Count 4), aiding and abetting a breach of fiduciary duty (Count 5), civil conspiracy (Count 6), conversion (Count 7), a breach of the duty of loyalty (Count 8), unjust enrichment (Count 9), and a violation of Cal. Civ. Code §§ 1709-10 (Count 10).

The Court will maintain supplemental jurisdiction over Counts 4 and 7. However, the Court declines to exercise supplemental jurisdiction over Counts 5, 6, 8, 9, and 10.

**Counts 4 & 7**. Counts 4 and 7 are within the scope of the remaining federal claim. Like the CFAA claim, these two counts rely on the same factual background: Velasquez's wrongful and continued possession of union property and her unauthorized access to the Union's computer system and files. The three claims also require similar proof. Thus, these two claims do not substantially predominate over the remaining federal claim.

28

**Counts 5-6, & 8-10**. In contrast, the fifth, sixth, eighth, ninth, and tenth claims are unrelated to the narrow CFAA claim and would predominate over this claim.

As described by Plaintiff, these state law claims are all factually related to "her federal fiduciary duties under the LMRDA." ECF No. 19 at 15. Counts 5, 8, and 10 focus explicitly on Velasquez's breached duties, and "Velasquez's liability for conspiracy and unjust enrichment depends entirely on proving that primary federal breach." *Id*. However, the LMRDA is dismissed as Plaintiff lacks a private right of action.

The remaining five state law claims also significantly differ from the sole remaining federal claim. While Count 1 focuses on Velasquez's actions after her employment and relates to unauthorized possession and use of Plaintiff's property, the five state law claims center on her alleged wrongful actions during her employment. For the same reasons, the state law claims will require a different set of evidence and witnesses compared to the federal claim. Thus, judicial economy, convenience, and fairness weigh in favor of declining supplemental jurisdiction. *See Gibbs*, 383 U.S. at 726 ("It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in consideration of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." (footnote omitted) (citation omitted)). Here, none of the salient considerations support exercising jurisdiction over the state claims. Accordingly, these five state law claims will be dismissed without prejudice.

/ / /

/ / /

/ / /

3:25-cv-02544-GPC-JLB

## V.    Count 4: California Computer Data Access and Fraud Act

Velasquez contends that Count 4 fails because "access" under § 502 refers to "hacking." As the FAC does not plausibly allege Velasquez hacked the computer, this claim fails in Velasquez's view. However, this argument is unavailing.

A person is found to be in violation of Cal. Penal Code § 502 if the person "[k]nowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." Cal. Penal Code § 502(c)(1). Under the statute, "access" is defined as "to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

While the statute is reminiscent of the CFAA, the Ninth Circuit has found this California statute to be distinct. *See United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015). Unlike the CFAA, "the California statute does not require *unauthorized* access. It merely requires knowing access." *Id*. (emphasis in original). Thus, Section 502(c)'s "focus is on unauthorized taking or use of information" rather than just access. *Id*. Access can include "includes logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly." *Id*. It can also encapsulate accessing, taking, copying, and making use of computer data that one formerly—but no longer—had authorization to access. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016) (once defendant was told to cease and desist it "knew that it no longer had permission to access [plaintiff's] computers at all" and continuing to access and use the data violated § 502); *see also Erhart v. BofI Holding, Inc.*, 387 F. Supp. 3d 1046, 1057-58 (S.D. Cal. 2019) (finding allegations that

3:25-cv-02544-GPC-JLB

the defendant exceeded the scope of employment by accessing the plaintiff's computer system was sufficient at the motion to dismiss stage); *Biden v. Ziegler*, 737 F. Supp. 3d 958 (C.D. Cal. 2024) ("Plaintiffs sufficiently contend and allege that they used his passwords to access password-protected files and ignored prelitigation demands to cease and desists.").

As established in the discussion for Count 1, Plaintiff terminated Velasquez's employment and ordered her to return the laptop. FAC ¶¶ 31, 34. These alleged actions demonstrate that Plaintiff knew she no longer had permission to access Plaintiff's computer system and data. The FAC, then, alleges that Velasquez "continues to possess and use the Union laptop and other Union property for personal use" and "downloaded and saved filed from protected Union computer systems locally to her Union provided laptop." *Id*. ¶¶ 34-35. These facts are sufficient to allege a violation of Section 502 at the motion to dismiss stage.

## CONCLUSION

For the foregoing reasons, the Court DENIES the motion to dismiss the first, fourth, and seventh claims and GRANTS the motion to dismiss the second, third, fifth, sixth, eighth, ninth, and tenth cause of action without leave to amend.

**IT IS SO ORDERED.**

Dated:  March 17, 2026

Hon. Gonzalo P. Curiel
United States District Judge

3:25-cv-02544-GPC-JLB